# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENERAL INSURANCE COMPANY OF AMERICA, a Washington corporation,<br><br>  Plaintiff and Counter-Defendant,<br>vs.<br><br><br>JOHN C. HARPER, JR., an individual, et al.,<br><br>  Defendant and Counter-Claimant. | CASE NO. 11cv0377-LAB (BGS)<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT; AND**<br><br>**ORDER SCHEDULING PRETRIAL CONFERENCE**<br><br>[DOC. #23] |

Plaintiff General Insurance Company of America ("General") brought this action for declaratory relief, seeking a declaration that damages awarded in a particular state-court judgment are not covered under the terms of a policy (the "Policy") issued to Westland Insurance Brokers, Inc. ("Westland"), and that General has no obligation to satisfy that judgment. John Harper, in his answer, included a counterclaim demanding that payment be made under the Policy for failure to defend, and seeking damages for breach of contract and breach of the implied covenant of fair dealing. Although there were other parties to this action when it was filed, they have since been dismissed, leaving General and Harper as the only two parties.

General moved for summary judgment or, in the alternative, for partial summary judgment, on its claims as raised in the complaint, and on Harper's claims as raised in the counterclaim.

General principally argues that it canceled the Policy, and the claim was not presented to it within the time required under the Policy's terms. In the alternative, it argues that even if its interpretation is incorrect, the mistake was reasonable so the covenant of good faith and fair dealing was not violated and punitive damages are inappropriate.

**Legal Standards**

The Court is sitting in diversity, so it applies federal procedural law, but state substantive law *See Zamani v. Carnes*, 491 F.3d 990, 995 (9th Cir. 2007); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Here, that means the Court applies California substantive law as handed down by the California Supreme Court. *See Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 427 (9th Cir. 2011). If there is no California Supreme Court decision to govern the decision, the Court will attempt to predict how the highest state court would decide the issue. *Id.*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to show there is a genuine issue for trial. *Id*. at 331. The Court may grant summary judgment as to some material facts. Fed. R. Civ. P. 56(g).

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

In ruling on a motion for summary judgment, the Court considers only facts that would be admissible in evidence. See Fed. R. Civ. P. 56(e); *Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 (9th Cir. 2012). A party may object as to the admissibility of evidence presented. Fed. R. Civ. P. 56(c)(2). A party cannot resist summary judgment by relying on mere allegations or denials of the moving party's evidence. *Anderson*, 477 U.S. at 248.

Construction of an agreement, such as a contractual insurance policy, is a question of law for the Court. *Trishan*, 635 F.3d at 426. When a contract is not ambiguous, summary judgment may be based on the Court's interpretation of the clear and unambiguous contractual provisions. *Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005, 1012 (S.D.Cal., 2006). Ambiguities, however, are construed in favor of the insured, to protect the insured's reasonable expectation of coverage. *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal.3d 903, 912 (1986); *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1475 (Cal. App. 4 Dist. 2010).

**Factual Background**

The following facts are undisputed or uncontroverted, except where noted. Harper was a licensed insurance agent and broker, and worked as an independent contractor for Westland. Harper's contract with Westland required that it maintain professional liability insurance that covered Harper. Westland purchased the Policy, effective April 1, 2008, which included coverage for errors and omissions.

In October of 2008, while the Policy was in effect, Westland ceased operations in the wake of financial misconduct by its operator, James Sim. Harper learned that not only was Westland closing down, but it had also committed wrongful acts against him, including breach of its obligations to him regarding management of funds in accounts for Harper's and Harper's clients' benefit, failure to disclose account deficiencies to him, and failing to make premium payments on the Policy as required by Harper's contract with Westland.

Out of concern for his liability, Harper sought legal assistance, and also left Westland around October 24, 2008. General then received a notice cancelling the Policy effective November 3, but offering Westland an option to purchase extended tail coverage. The notice

also reminded Westland to consult the "claims-made" provision of the Policy, which provided that General would pay only claims arising during the Policy's effective period and reported to General in writing within 60 days of the end of the policy period.

Harper then made efforts to seek redress from Westland for its wrongful acts. On October 31, his attorney, Jack Winters, sent a letter to Westland (Mot. for Summ. J. (Mot.), Ex. M at 130–41.) Westland did not immediately send a copy of this letter to General. That same day, however, Winters also sent a letter to General. (Opp'n to Mot., Ex. 1.)[1] Harper argues this letter gave General a notice of potential claims. (Opp'n to Mot., 1:12–18 (citing evidence).) In addition, during the following weeks, Winters sent two more letters to General concerning claims under the Policy. (*Id*., 1:18–23 (citing evidence).) General, in response, sent a letter saying it had begun its investigation concerning coverage for Harper's claim. (*Id*., 1:23–26 (citing evidence).) The parties don't dispute in this Motion that the claims Harper made against Westland are the types of claims the Policy covers; what is in dispute is whether they were properly reported.

Early in 2009, Harper was sued, along with Westland and Sim; Harper filed a cross-claim against Westland and Sim. Then on April 9, 2009, Harper filed his complaint against Westland, Sim, and Westland Management Services, Inc. for various acts of malfeasance, and breaches of their obligations to Harper. General refused to indemnify, contending that

---

[1] The letter is actually addressed to SAFECO Insurance. Both names are on the Policy. The Policy itself doesn't identify which company is the insurer for purposes of reporting, but merely defines "we" and "us" (as used in the policy) as "the company providing this insurance," without in turn identifying which company that is. (Mot., Ex. B at 25.) The Counterclaim (¶ 28) alleges that General does business in California under both names, that General is a wholly-owned subsidiary of SAFECO and of Liberty Mutual Insurance Company, and that General and SAFECO use the same adjusters, claims examiners, attorneys, and inter-company communication system. General's answer admits most of paragraph 28's allegations, but denies the allegations regarding subsidiary relationship, and use of the same adjusters, examiners, attorneys, and communication system. General's evidence also includes an acknowledgments that General is a SAFECO company. (Mot., Ex. at 5 (Decl. of Timothy Littlejohn), ¶ 3.) Its evidence suggests that at some point after the events giving rise to this lawsuit, General ceased being a SAFECO company. (Mot., Ex. at 7 (Decl. of Brenda Stover), ¶ 3.)

Because the facts are viewed in the light most favorable to the non-moving party, and because the terms of the Policy are also construed in his favor, the Court accepts that letters sent to SAFECO were an acceptable method of notifying General of a claim or possible claim.

the Policy's requirements regarding notice were not met. The litigation led to arbitration of damages, and judgment for Harper was entered in the amount of $534,488.19. Westland and Harper agreed that, for an assignment of Westland's claims against General, Harper would not execute the judgment against Westland.

General then filed this action for declaratory relief. General says it first learned of the October 31 demand letter on Westland during discovery.

**Discussion**

As assignee of Westland's benefits under the Policy, Harper "stands in the shoes" of the assignor, Westland. *See Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (quoting *Bush v. Superior Court*, 10 Cal. App. 4th 1374, 1380 (Cal. App. 3 Dist. 1992)). As such, Harper takes the same interests, rights, and remedies as Westland had against General before the assignment, subject also to any defenses that could have been asserted before notice of the assignment was given. *See Searles Valley Minerals Operations, Inc. v. Ralph M. Parson Serv. Co.*, 191 Cal. App. 4th 1394, 1402 (Cal. App. 4 Dist. 2011) (citing *Johnson v. County of Fresno*, 111 Cal. App. 4th 1087, 1096 (Cal. App. 5 Dist., 2003); *and* Cal. Civ. Proc. Code § 368.5).

The Policy is a "claims-made-and-reported" policy; it covers only events occurring during the policy period and reported within the specified time limits. Under Sections I.B and VII.A of the policy, coverage is triggered by reporting of a claim to the insuror. "Claim," in turn is defined in Section IV.D as "a demand . . . received by the Insured for damages . . . ." A claim includes but is not limited to the initiation of a lawsuit. The Policy also includes a "possible claims"[2] provision, Section VII.B, under which the insured can report potential claims within the time limit. Claims made later, arising out of the wrongful act identified in the notice of potential claim are deemed to have been made on the date the notice of possible claim was received.

General's briefing appears to treat the October 31 letter to Westland as the only notification of a claim or potential claim, and to rely on the fact that it wasn't forwarded to

---

[2] This section uses "possible claim" and "potential claim" interchangeably.

General until much later. (Mot., 13:20–25 (summarizing the three issues General believed the summary judgment motion turned on); *compare* Obj. to Pl.'s Evidence (Docket no.27), 2:3–16 (objecting to, *inter alia* evidence of other correspondence as irrelevant to the question of whether Harper's letter to Westland was forwarded to General).) But General points to nothing in the Policy forbidding giving notice more than once, or of one insured giving notice for others as Harper's attorney evidently attempted to do.[3] In fact, Harper points to evidence that his attorney sent a second letter on that same date to General,[4] a follow-up letter he sent, and a reply letter sent to him by Brenda Stover on behalf of SAFECO. (Opp'n, Exs. 6, 7.)

Harper construes General's argument as being that the letter he sent General was the one and only claim, or that it somehow created a new and different claim, negating the effect of any letters he sent to SAFECO, so that they were neither claims nor notices of potential claims. While this is one possible reading of General's briefing, it is also possible that General is not acknowledging the SAFECO correspondence at all, because it supposes Harper's argument is merely that General was on constructive notice. Either way, General's argument fails.

The Policy's clause concerning possible claims (VII.B) requires that the notice be sent no later than 60 days after the Policy's cancellation. (Mot., Ex. B at 32.) It requires that the notice mention the potential claimant's name and address; a description of the professional services that were or allegedly should have been provided; an explanation of why the insured believes the claim may be made and the date the insured became aware of the possible claim; and an explanation of the type of claim anticipated. (*Id*.) If these

---

[3] The Policy (Section VII.A) refers to the "Insured's Duties in the Event of a Claim." Within the meaning of the policy, "Insured" includes both Westland and Harper. The terms of this provision focus on an insured giving notice of claims against himself, but it does not rule out the insured giving notice of claims he has against another insured. This provision is written broadly, requiring an insured to cooperate with General "with respect to any claim." If, for example, Westland had been sued for something Harper did, Harper might have been required to submit to questioning or cooperate with investigations or litigation.

[4] For purposes of this motion, the Court treats the letters to SAFECO as having been sent to General. *See supra* note 1.

requirements are met, any claim subsequently made against the insured arising out of the wrongful act identified in the notice will be treated as having been made on the date the notice was given.

The exchange of letters between Winters and SAFECO was well within the notification period, and SAFECO acknowledged the October 31 letter Winters sent to it. The initial letter prominently says "Please consider this a notice of a possible claim pursuant to ¶ B of Section VII of the subject policy," and goes on to describe the malfeasance at Westland that might give rise to claims, who the claimants might be, and what claims they might bring. (Opp'n to Mot., Ex. 1 at 172–74.) In general, it does not name claimants, but describes which clients might bring claims, *i.e.*, those who had policies written through Westland that lapsed or were cancelled because of malfeasance. (*Id.*) It <u>does</u>, however, say "Mr. Harper, as well as a number of the other brokers, may also have their own claims . . . arising from this situation as well." (*Id.*)

The November 7 letter of Brenda Stover, the SAFECO employee, acknowledging Winters' letter, says "Safeco/General Insurance Company of America is aware of the potential for claims to be made against Westland Insurance Brokers' errors and omissions policy." (Opp'n to Mot., Ex. 7 at 196.) It goes on to say no claims had been received, but asks Winters or Harper to forward any actual notices of claims they receive. (*Id*. at 196, 198.) If SAFECO had had any questions, or quibbles about whether notice of potential claims was adequately given, this would have been the time to say so, rather than telling Winters that General was aware of the potential claims and leaving it at that.

Winters' second letter, dated November 7,[5] is more specific as to the claims, and identifies itself as "notice of an actual claim pursuant to ¶ A of Section VII of the subject policy." (Opp'n to Mot., Ex. 6 at 192–95.) It mentions a policy Harper arranged for AV Builders, which was required to provide proof of insurance so that it could do business. The transaction involved financing and payments made to multiple entities. After the Sowers

---

[5] This letter apparently crossed in the mail with Brenda Stover's reply to Winters' October 31 letter.

Baccala Insurance Brokerage and Socius LLC, made a payment to an insurance company, Westland's check to the Sowers brokerage bounced. Mr. Tom Sowers, of the Sowers brokerage, demanded that Sim and Harper, or Sim alone, make it good. The letter also says the insurance company would be sending AV Builders a notice of cancellation, leaving AV Builders without insurance and still liable on the financing agreement. The letter requested that SAFECO provide counsel to represent Harper, and said Harper could not cover the losses to Sowers, and requested $175,000 be given to Harper so that he could resolve the claim with Sowers. (*Id.*) The letter predicted that AV builders would "undoubtedly prosecute a claim against Westland and Mr. Sim, as well as Mr. Harper, if this matter is not immediately resolved." (*Id.* at 195.) The letter also noted that "As to all insureds under the subject policy, the claim should be considered notice for all of these individuals and entities." (*Id.*)

Brenda Stover sent a letter dated November 12, 2008 acknowledging Winters' November 7 letter and telling him General was the errors and omissions insurer for Westland, and that the investigation into the facts of the matter he described had begun. (*Id.*, Ex. 10 at 237.)

Winters then wrote a third letter to Stover at SAFECO, dated November 20, 2008, expressing dissatisfaction with the way the claims were being handled. Among Winters' frustrations were her misunderstanding of the claim and the claimant(s). (Opp'n to Mot., Ex. 11 at 238–40.) This letter said, among other things,

> While we understand Mr. Harper and others may have claims against Westland, . . .the claim with which we are immediately concerned is the one against Mr. Harper being made by Sowers Baccala Insurance Brokerage. You[r] letter lists Westland as your only "insured". Your insured, for purposes of the claim we are presenting, is Mr. John Harper — not Westland. As I previously advised you, Mr. Harper is an additional insured on the errors and omissions policy. To date you have failed to acknowledge this.

(*Id.* at 239.) While mentioning Harper's claims against Westland, the letter focused on the immediate claim, for which General ultimately denied Harper a defense.

The Sowers brokerage filed suit against Westland, Sim, and Harper. (Opp'n to Mot., Ex. 12 at 241–47.) Harper filed a cross-complaint against Westland in that action, seeking indemnity. A few weeks later, he filed a complaint in a direct action against Westland and

Sim, bringing similar claims based on the same underlying conduct, *i.e.*, that their malfeasance had caused his errors and omissions insurance to be canceled, interfered with his relationships with his clients, exposed him to liability and caused him to incur costs cleaning up the mess they had created. The direct action is what gives rise to the claims he brings in this suit. His claims amount to a demand that General indemnify losses resulting from that suit, and pay the costs of the legal defense, which it was contractually obligated to provide.

Harper argues that Winters' letters to SAFECO amounted to a timely notice of claims. In the absence of any coherent argument from General why they would not be, the Court is inclined to agree. They appear to have been sent to the right company, they were acknowledged, General (or SAFECO) said it was investigating them, and Winters' November 7 follow-up letter gave adequate notice of the legal action the Sowers brokerage eventually filed. Winters' November 7 letter also demanded money and a defense for Harper. Although the letter predicted a suit by AV Builders, its notice about who might be bringing claims against whom is couched in very general language, referencing not only AV Builders, but also Sowers, Westland, Sim, and Harper, and giving warning that a lawsuit was likely to erupt between some combination of them. For instance, the letter says "As to all insureds under the subject policy, the claim should be considered notice for all of these individuals and entities." (Opp'n to Mot., Ex. 6 at 195.)  This would include the Sowers claim against Westland, Sim, and Harper, as well as Harper's cross-complaint against Westland and Sim. It is worth mentioning that, under the Policy (Section III.A and III.B), Harper, Westland, and Sim were all insureds, so this letter can also suffice as a notice of claims against Westland and not only those against Harper.

It is also noteworthy that the Policy (Section VIII.A) required Harper to "do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the Insured may have." (Mot., Ex. B at 32.) The letter requested that Harper be given cash to resolve the related matter with Sowers, and specifically asked General to retain counsel for him, which it did not do. (Opp'n to Mot., Ex. 6 at 192.)  Harper also adduces indirect

evidence that General was told of the October 31 letter his attorney sent to Westland. (Opp'n to Mot., 18:11–19:3 (citing evidence).)

Harper also points out that General defended Westland against Harper's cross-complaint. (Opp'n at 20:4–13 (citing evidence).) This also serves as evidence that General was given adequate notice of Harper's claim against Westland; if notice was not adequately and timely given, General would have had no obligation to defend Westland.

The Court concludes that Harper has presented sufficient evidence from which a trier of fact could conclude he gave either notice of the potential claim, or notice of the actual claim, either of which would trigger coverage for the claims he now brings.

General has relied solely on either the failure of Harper's principal claim, or a good faith mistake as a basis for granting summary judgment as to Harper's claim for punitive damages. *See Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4t 335, 345–46 (Cal. App. 2 Dist. 2001) (punitive damages are available if insurance company acted unreasonably or without proper cause).

Harper presents evidence that could support a finding that General falsely claimed never to have received any notice of Harper's claims against Westland (Mot., Ex. Q at 168), did not conduct an adequate investigation as it said it would be doing (Winters Decl. ¶¶ 4–5 (attesting to General's lack of inquiry about letters)), and denied a defense without discussing the matter with Sim, Harper, or their respective attorneys. (Opp'n to Mot. 14:15–18 (citing evidence).)

Because there is adequate evidence from which a jury could determine General acted unreasonably or with an improper purpose, with conscious and deliberate acts of unfairness towards Harper, the motion will be denied as to this issue as well.

**Ruling on Objections to Evidence**

Under Fed. R. Civ. P. 56(c)(2), a party may object as to the admissibility of evidence presented. General has filed extensive objections (Docket no. 27), to which Harper filed a response. (Docket no. 29.)

/ / /

Most of the objections are moot, because the Court does not rely on the evidence objected to. General objects to Harper's exhibits 1–16 as irrelevant, but to the extent they are cited and discussed above, they are relevant. Of the exhibits the Court has relied on in this opinion, General objects to Exhibit 1, the October 31 letter from Winters to General, as unauthenticated because Winters' authentication is not based on his personal knowledge that the exhibit is a true and correct copy. But Winters' signature is on the letter, and his declaration says he himself wrote and sent it. (Winters Decl., ¶ 2.) This easily satisfies the requirement for authentication. The objections are therefore **OVERRULED**.

**Conclusion and Order**

For the reasons set forth above, General's motion for summary judgment or, in the alternative, for partial summary judgment, is **DENIED**. The Court previously vacated the pretrial conference, and now **RESCHEDULES** it for **Monday, May 6, 2013 at 12:00 noon**.

**IT IS SO ORDERED**.

DATED: March 28, 2013

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge